**FILED**

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

AUG 0 5 2016

CLERK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| LISA A. DAVIS, | * | CIV 12-5008 |
|  | * |  |
| Plaintiff, | * |  |
|  | * | MEMORANDUM OPINION AND |
|  | * | ORDER GRANTING IN PART AND |
|  | * | DENYING IN PART DEFENDANTS' |
|  | * | MOTION FOR SUMMARY JUDGMENT |
| vs. | * |  |
|  | * |  |
| CRESCENT ELECTRIC SUPPLY, | * |  |
| COMPANY ("CESCO") a Delaware | * |  |
| Corporation; JAMES M. SULLIVAN, | * |  |
| CESCO 015 Branch Manager; MARTIN S. | * |  |
| BURBRIDGE, President/CEO; JAMES R. | * |  |
| ETHEREDGE, Sr. Vice Pres./CFO; | * |  |
| CHRISTOPHER P. BRESLIN, | * |  |
| Sr. Vice Pres./COO; DANIEL E. | * |  |
| PHILIPPI, Vice Pres.-Human Resources, | * |  |
|  | * |  |
| Defendants. | * |  |
|  | * |  |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Before the Court is Defendant Crescent Electric Supply Company's ("CESCO" or "Defendants") Motion for Summary Judgment against Plaintiff Lisa A. Davis ("Davis" or "Plaintiff"). According to Davis, this federal action is based primarily on wage discrimination and retaliation, but "is not a sexual harassment case." Plaintiff's Response to Defendants' Statement of Material Facts, Doc. 132, at 43-44. Sexual harassment is only relevant here insofar as it created a hostile work environment in retaliation to Davis's EEOC complaints. *Id.* at 44. For the following reasons, the motion is granted in part and denied in part.

On July 21, 2016, Davis filed a motion for leave to file a second amended complaint, Doc. 130. In addition, the proposed Second Amended Complaint, Doc. 130-1, was submitted. The Court grants the motion and bases this memorandum opinion on the Second Amended Complaint, Doc. 130-1. In addition, on August 1, 2016, Davis filed her response to Defendants'

Statement of Material Facts ("Plaintiff's Response"), Doc. 132. The Court will consider those papers in ruling on CESCO's Motion for Summary Judgment.

## BACKGROUND

Davis formerly worked for Defendant Crescent Electric Supply Company ("CESCO"). CESCO is an electrical distributor with over 120 locations and about 1550 employees throughout the United States. She began work at CESCO on August 31, 2005 in a clerical position. During all relevant time of Davis's employment, Defendant James M. Sullivan ("Sullivan") was her direct supervisor. For her clerical position, Davis received an hourly wage. On June 1 2010, Davis was promoted to a sales position–Quotations Specialist–as a replacement to Ken Herman ("Herman"). Prior to Davis accepting the position, Herman implied to Davis that she would receive commissions as part of being a Quotations Specialist. Sullivan, however, indicated only that Davis would receive a raise, but did not state that that raise would be in the form of commissions. Davis did receive a pay increase of $2.10, raising her pay rate of $12.40 per hour to $14.50 per hour. Affidavit of Nathan R. Chicoine in Support of Defendants' Motion for Summary Judgment (Chicoine Affidavit), Doc. 69-1, at 8; Chicoine Affidavit, Doc. 69-8.

As a Quotations Specialist, Davis received a list of jobs to bid on. She then had to request plans and produce counts of light fixtures to the customer. Prior to accepting the Quotations Specialist position, Davis had no experience in quotations. She was told by Sullivan, however, that she would not need product training. Plaintiff's Response, Doc. 132, at 12. As a result, Davis did not pursue product training. *Id.* Training for the position itself was conducted between the incoming and outgoing Quotations Specialists.

On November 29, 2010, via email, Davis told Sullivan that she was informed by Herman that she would receive commissions as a part of the promotion. Davis wanted to know when she would receive the same. In a response email, Sullivan informed Davis that Herman did not have anything to do with wage decisions and should not have told her that she would receive commissions. Sullivan further explained that commission pay for her position was not budgeted for the year, and that she received an hourly pay rate increase instead.

Around January 1, 2011, Davis was placed in CESCO's warehouse in an effort to familiarize Davis with CESCO's products and help her successfully return to the Quotations Specialist position. Defendants' Statement of Material Facts ("DSMF"), Doc. 70, at 6 ¶¶39-40. It is disputed whether her duties in the warehouse were actually in furtherance of the quotations

2

positon. *See* Plaintiff's Response at 22. Davis's hourly pay rate was unaffected. Her duties in the warehouse included emptying garbage, assisting customers at the counter sales, writing orders, and stocking shelves. Plaintiff's Response at 23.

On February 16, 2011, Davis was again reassigned, this time to Project Specialist positon, a new position that was created for Davis. DSMF at 7 ¶ 44; Plaintiff's Response at 22. The Project Specialist positon was created for Davis and only existed at CESCO during Davis's time in the position. Plaintiff's Response at 25. Her hourly pay rate was again unaffected and her duties as Project Specialist were similar to the Quotations Specialist position, except that, as Project Specialist, Davis no longer bid on jobs. Chicoine Affidavit, Doc. 69-2, at 6. Instead, Davis supported the new Quotations Specialist, Kody Mendel ("Mendel"), on the clerical components of quotations. *Id.* at 7. According to Davis, the Project Specialist position "was just like a clerical position to help all the sales people for the quotations person to get their jobs done." Plaintiff's Response at 24. Davis held the Project Specialist position until June 2011, at which time she resigned from the position. Chicoine Affidavit, Doc. 69-2, at 8.

Related to her reassignments, Sullivan had been reviewing Davis's performance from February 25, 2011 to March 14, 2011 and concluded that Davis struggled to understand CESCO's product line. DSMF at 8 ¶¶ 55-57. Davis states that it was customary for her to be allowed input related to the appraisals. She claims she was not allowed to do so during the February and March appraisals. Second Amended Complaint, Doc. 130-1, at 14. Her electronic signature, however, appears on the second-to-last page of the appraisal. Chicoine Affidavit, Doc. 69-17, at 12.

Sometime in April 2011, Davis complained to CESCO of wage discrimination. *Compare* Second Amended Complaint, Doc. 130-1, at 13 (stating that the date of the complaint was April 25, 2011) *with* DSMF at 7 ¶ 49 (misstates the year as 2010, but correctly states April as the month). Julie Skinner ("Skinner" or "Steinstra"), CESCO's HR Generalist, investigated Davis's complaint. As a result of the investigation, Skinner concluded that Davis's Quotation Specialist successor, Mendel, while receiving commissions, was making approximately $2,000 less than Davis. The investigation further concluded that Davis was moved out of the Quotation Specialist position as a result of her performance. Skinner informed Davis of her conclusions in a letter dated April 27, 2011, Chicoine Affidavit, Doc. 69-10.

3

Between March and May 2011, Davis encountered behaviors of Mendel that she considered to be sexual harassment directed toward her. Interpreting these behaviors as retaliation for her discrimination complaint, Davis, on May 16, 2011, filed a complaint with CESCO HR again. Second Amended Complaint, Doc. 130-1, at 13-14. Davis did not know for certain if Mendel was aware of her wage discrimination claim to HR. Chicoine Affidavit, Doc. 69-2, at 10. Davis does not recall complaining of Mendel's actions to Sullivan. Similar to the April 27 letter from Skinner related to the discrimination claim, Skinner sent Davis a letter on May 26, 2011 informing Davis of Skinner's conclusions related to the sexual harassment/retaliation claim. In the letter, Skinner stated that she believed Mendel should receive disciplinary action for the behavior detailed by Davis. Mendel was suspended for two days without pay. Plaintiff's Response, Doc. 132-8.

Around June 3, 2011, Davis contacted personnel at the regional Equal Employment Opportunity Commission (EEOC) office. Davis filed a formal complaint with the EEOC on or about that same day alleging claims of wage discrimination and retaliation. Second Amended Complaint, Doc. 130-1, at 14. On June 16, 2011, Davis resigned from CESCO. Davis filed her complaint in this Court on February 8, 2012.

Defendants filed the instant Motion for Summary Judgment, Doc. 68, on April 16, 2015. On May 29 2015, Davis's then-attorney-of-record, Deborah Dubray, withdrew as Davis's counsel, Doc. 78, and Davis's current attorney-of-record, Mario Gonzalez, began handling Davis's case, Doc. 79.[1] DuBray never responded to Defendants' motion. Since that time, there have been several intervening motions, two of which the Court previously dealt with, Docs. 121, 122. Not having received papers in opposition to CESCO's motion for summary judgment, on July 14, 2016, the Court issued an Order, Doc. 129, providing Davis with seven business days within which to file papers she wished to be considered by the Court related to Defendants' motion. In that time, Davis filed a Motion for Leave to File a Second Amended Complaint, Doc. 130. In addition, on August 1, 2016, Davis filed her opposition to Defendants' statement of material facts, Doc. 132.

In the Second Amended Complaint, Davis has removed four counts that were recited in the First Amended Complaint: Tortious Interference with a Business Expectancy (Former Count

---

[1] On May 11, 2016, a third attorney, Terry L. Pechota, noticed his appearance on behalf of Davis. It thus appears that both Gonzalez and Pechota are presently representing Davis.

4

4), Intentional and/or Negligent Misrepresentation (Former Count 5), Adversarial Investigation and Breach of Confidentiality (Former Count 8), and Intentional or Negligent Supervision (Former Count 9). Contained in the Second Amended Complaint are as follows: Wage Discrimination Based on Gender, Hostile Work Environment, Retaliation, Disparate Treatment Based on Gender (Clerical Designation), Disparate Treatment Based on Gender (Training), and Constructive Discharge. Each of these six counts was also recited in the First Amended Complaint. Davis has pled an additional count, however, that was not in the First Amended Complaint: Breach of Oral Contract. Because Defendants' Motion for Summary Judgment addressed six of the seven counts contained in Davis's Second Amended Complaint, the Court will proceed to rule on the motion relative to those counts. The seventh count will not be addressed at this time.

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A party asserting that a fact cannot be . . . disputed must support the assertion" either by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the . . . presence of a genuine dispute[.]" Fed.R.Civ.P. 56(c)(1)(A)-(B). "The movant can also establish the absence of a disputed material fact by showing 'that an adverse party cannot produce admissible evidence to support the fact.'" *Jensen v. Hy-Vee Corp.*, No. CIV. 09-4057-KES, 2011 WL 1832997, at *1 (D.S.D. May 13, 2011) (quoting Fed.R.Civ.P 56(c)(1)(B)). "The burden is initially placed on the moving party to establish the absence of a genuine issue of material fact and that the party is entitled to judgment as a matter of law." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the party seeking summary judgment has met this initial burden, the burden then shifts to the non-moving party who must demonstrate "that a fact . . . is genuinely disputed" either "by citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed.R.Civ.P 56(c)(1)(A)-(B). "For purposes of summary judgment, the facts, and inferences drawn from those facts, are 'viewed in the light most favorable to the party opposing the motion.'" *Jensen*, 2011 WL 1832997, at *2 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Employment discrimination cases are not immune from summary

5

judgment, and there is no separate summary judgment standard that applies to these cases. *See Fercello v. County of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010).

## DISCUSSION

### Wage Discrimination

The Eighth Circuit has held that Title VII wage discrimination claims are subject to the Equal Pay Act framework. *See Horn v. Univ. of Minn.*, 362 F.3d 1042, 1045 (8th Cir.2004); *Tenkku v. Normandy Bank*, 348 F.3d 737, 741 (8th Cir.2003). The Equal Pay Act is a strict liability statute that prohibits discrimination in wages on the basis of sex even where there is no showing of discriminatory intent. *Bauer v. Curators of Univ. of Mo.*, 680 F.3d 1043, 1045 (8th Cir.2012); 29 U.S.C. § § 206(d).

> A plaintiff must first establish a prima facie case that women were paid less than men in the same establishment for equal work requiring equal skill, effort, and responsibility and performed under similar working conditions. *Hutchins v. Int'l Bhd. of Teamsters*, 177 F.3d 1076, 1080 (8th Cir.1999). If a plaintiff establishes a prima facie case, the burden then shifts to the defendant to prove one of four statutory affirmative defenses. *Id.* at 1081. Those defenses require an employer to prove that any wage differential is explained by "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). In an EPA case, "a defendant cannot escape liability merely by articulating a legitimate non-discriminatory reason for the employment action .... [it] must prove that the pay differential was based on a factor other than sex." *Taylor* [*v. White*], 321 F.3d [710,] 716 [(8th Cir.2003)].

*Price v. Northern States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011).

Here the record shows that, even with his commissions, Davis was paid more than Mendel. That Mendel was paid less is controverted only insofar as Davis did not know how her pay rate compared to others. Chicoine Affidavit, Doc. 69-2, at 4. There is no evidence in the record controverting that Davis received an hourly-rate pay raise upon accepting the Quotations Specialist position. Moreover, with that raise, she was being paid more than Mendel. *See Id.*, Doc. 69-10, at 1 (letter from Skinner to Davis explaining that Davis was being paid more than Mendel). While, in Davis's response to Defendants' material facts, Doc. 132., she claims that, among other things, she was entitled to commissions and was demoted, she does not controvert that she was paid more than Mendel. *See* Plaintiff's Response at 29. Thus, she has failed to establish a *prima facie* case. *See, e.g., Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 684 (8th Cir. 2001).

Even if the Court were to assume that Davis has proved her *prima facie* case, Defendants have demonstrated that their system of compensation satisfies, at the least, the first and second affirmative defenses above–a seniority system and a merit system. Mendel had more experience than Davis so Crescent Electric has proof of justification for paying him commissions. In addition, Mendel, due to his previous sales experience, was already receiving commissions before moving into the Quotations Specialist position. "Employees do not always earn commission when they transfer to sales at CESCO. Sullivan determined who earned commission based on length of service, reviews, and reliability, among other criteria." Offering nothing to controvert CESCO's arguments, summary judgment will be entered against Davis on her claim of wage discrimination.

## Hostile Work Environment

To satisfy a claim of hostile work environment, Davis must show (1) that she is a member of a protected group, (2) she was the subject of unwelcome sexual harassment, (3) the harassment was based on sex, (4) a term, condition, or privilege of her employment was affected by the harassment, (5) her employer knew or should have known of the harassment and the did not take proper remedial action. *Stuart v. General Motors Corp.*, 217 F.3d 621, 631 (8th Cir. 2000). *See Rickard v. Swedish Match North American, Inc.*, 773 F.3d 181, 184-85 (quoting *Peterson v. Scott Cnty.*, 406 F.3d 515, 523-24 (8th Cir. 2005), *abrogated on other grounds by Torgenson v. City of Rochester*, 643 F.3d 1031, 1043, 1059 app. (8th Cir. 2011) (en banc)) (stating a similar test for age-based hostile work environment). Plaintiff must show that "the harassment [] create[d] 'an environment that a reasonable person would find hostile and one that the victim actually perceived as abusive." *Rickard*, 773 F.3d at 185 (quoting *Clay v. Credit Bureau Enters., Inc.*, 754 F.3d 535, 540 (8th Cir. 2014) (citation omitted)) (internal quotations omitted). Alleging "'simple teasing' [or] 'offhand comments'" is not sufficient to support a claim of hostile work environment. *Id.* (quoting *Scott Cnty.*, 406 F.3d at 524 (citation omitted)) (internal quotations omitted). "To be actionable, a 'sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Stuart*, 217 F.3d at 631 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citation omitted)). To determine if the conduct rises to the actionable level, courts may look to "'the circumstances' including 'the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* at 631-32 (quoting *Faragher*, 524 U.S. at 787-88). "The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "Whether [the] conduct [of the claimed harasser] rose to the level of sexual harassment is usually a factual determination for the jury." *Moring v. Arkansas Dept. of Correction*, 243 F.3d 452, 456 (8th Cir. 2001) (citation omitted).

As to the first prong, the Court finds that Davis is a member of a protected group. *See Stuart*, 217 F.3d at 632 (Eighth Circuit assumes that the plaintiff, a woman, was a member of a protected class). Viewing the facts most favorably to Davis, the record also supports the second, third, and fifth prongs. According to Davis, Mendel subjected her to sexual harassment on various occasions during the months of March, April, and May 2011. She details several in her deposition: (1) Mendel asked Davis if she had a futon couch in her office. When Davis asked why he was asking, Mendel replied "so we can go in there and turn the lights off." Chicoine Affidavit, Doc. 69-2, at 10. (2) While Davis and a customer were in a meeting, Mendel entered the room and stated, "What are you two doing in here? Aren't you both married?" Mendel then shut the door and left. Davis took this to be an insinuation that she and the customer were in a sexual relationship. *Id.* at 10-11. (3) Mendel, referencing batteries on Davis's desk, asked Davis "if the batteries were running low in her vibrator." *Id.* at 11. (4) Mendel tells Davis that she looks tired and asks if she was up all night thinking about another female coworker, Cathy Holt ("Holt"). *Id.* Davis inferred that Mendel was suggesting that Davis and Holt were in a sexual relationship. (5) On or about May 11, 2011, Davis was attempting to return to her office when Mendel intentionally stood in her path. When Davis attempted to move around Mendel, he would also move in order to continue blocking her path. This pattern continued several times until Davis asked Mendel to stop. Davis did not perceive this event to be sexual, but harassing in nature. *Id.* (6) As Davis was using a coffee machine, Mendel approached Davis from behind and put his hands around her waist. Davis told him to not "ever touch [her] again. *Id.* at 11-12. (7) Mendel asked Davis if there was anything she needed done in her office. When Davis asked Mendel what he meant, he replied, "something physical." Davis then asked what that meant. In

8

response, Mendel smiled and said "that they could do 'whatever she wanted' and walked away." *Id.* at 12 (quoting Mendel).

On May 13, 2011, Davis sent Mendel an email informing him that he had been violating CESCO's sexual harassment policy. *Id.*, Doc. 69-5. Mendel apologized to Davis thereafter. According to Davis, however, Mendel continued to make inappropriate comments to her via email. *Id.*, Doc. 69-2, at 12. Davis offered no specific examples of these comments in her deposition. Shortly thereafter, Davis filed a complaint with HR. Skinner responded with a letter to Davis on May 26, 2011. The letter indicated Mendel would be disciplined.

CESCO makes much of the fact that Davis did not, or cannot remember if she did, complain to Sullivan about Mendel's behavior. The record shows, however, that Davis protested to Mendel after a majority of the above incidents. Ultimately, she sent an email to Mendel complaining about his behavior. In addition, some of the encounters between Davis and Mendel were overtly sexual in nature, while others were inferred by Davis to be sexual insinuations. CESCO argues that because Davis did not complain to Sullivan, her direct supervisor, she has failed to demonstrate that she found Mendel's behavior to be unwelcome. The Court is unpersuaded. In *Stuart*, the Eighth Circuit found that the plaintiff there did not "consider[] herself subject to unwelcome sexual harassment at any time prior to July 14, 1996, when she first complained to her [supervisor]. *Stuart*, 217 F.3d at 632. The Eighth Circuit placed emphasis on the plaintiff's complaint to her supervisor because that was the first and only complaint she had made up to that point. Here, however, Davis had complained directly to Mendel himself before contacting HR. These complaints make clear that she found Mendel's interactions with her unwelcome. The significance that CESCO places on Davis's not reporting to Sullivan is misplaced. The second and third prongs of the *prima facie* case are satisfied.

As to the fifth, while Davis states in her deposition that she either did not or could not remember if she did complain to Sullivan about the incidents, the record is clear that Davis did complain to CESCO HR. As a result of the complaints, Mendel was suspended for two days without pay. Plaintiff's Response, Doc. 132-8. The fifth prong is a closer call than the above, however. The first part of the fifth prong is satisfied as Davis made CESCO officials aware of the sexual harassment. As to the second part of the fifth prong, as mentioned, the record does show that CESCO suspended Mendel for two days without pay. There is no clear answer, however, whether this was an adequate disciplinary response. Compared to the remedial action

9

undertaken by the employer in *Stuart*, it appears that Davis has satisfied the fifth prong in full. *See id.* at 633-34 (the record there demonstrated the various ways the employer responded to the plaintiff's complaints of sexual harassment, which the Eighth Circuit found to be reasonable).

As to the fourth prong, the Court finds that the record does establish that "a term, condition, or privilege of [Plaintiff's] employment was affected by the harassment." In *Moring*, the Eighth Circuit found a single incident between the plaintiff and the harasser to be sufficient to support a jury verdict of hostile work environment. There,

> [the harasser] was [the plaintiff's] supervisor. They were on an overnight business trip. He suggested that she might not be safe in her hotel room, or that they might be the object of animosity from people at Calico Rock[, Arkansas, the city they were traveling to in order to conduct drug evaluations on employees]. [The harasser] knocked on [the plaintiff's hotel room] door clothed only in boxer shorts. After entering her room he repeatedly insisted that [the plaintiff] 'owed' him for her job. He would not leave the hotel room, although [the plaintiff] repeatedly asked him to leave. Finally, he sat on her bed, touched her thigh and leaned in as if to kiss her.

*Moring*, 243 F.3d at 456-57. The Eighth Circuit found that sufficient evidence existed to support the jury's finding that the hotel incident "was severe enough to alter the terms and conditions of [the plaintiff's] employment." *Id.* at 457. The *Moring* Court noted that it was "unaware of any rule of law holding that a single incident can never be sufficiently severe to be hostile-work-environment sexual harassment." *Moring*, 243 F.3d at 456.

Here, drawing all inferences in Davis's favor, the record shows that Mendel, on at least two occasions, suggested to Davis that the two should engage in a sexual relationship. At one point, he approached Davis from behind and placed his hands on her waist. While never complaining to Sullivan, Davis objected to Mendel's behavior, eventually sending Mendel an email instructing him that he was in violation of CESCO workplace policy. Based on the Eighth Circuit's holding in *Moring*, this Court finds that Davis has satisfied the *prima facie* case of hostile work environment based on sexual harassment. CESCO's motion for summary judgment on that count is denied.

## Retaliation

Title VII "makes it unlawful for employers to retaliate against an employee or applicant for employment because she 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Brower v. Runyon*, 178 F.3d

10

1002, 1005 (8th Cir. 1999) (quoting 42 U.S.C. § 2000e-3(a)). To make out a case of retaliation, a plaintiff must show: "(1) she engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal connection existed between participation in the protected activity and the adverse employment action." *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 713-14 (8th Cir. 2000), *reh'g en banc denied*. Upon establishing a *prima facie* case, the burden shifts to the defendant-employer to produce some legitimate, non-discriminatory reason for the action. *See id.* at 714; *Stevens v. St. Louis University Med. Ctr.*, 97 F.3d 268, 270-72 (8th Cir. 1996) (the burden-shifting analysis of *McDonnell Douglas* applies to Title VII retaliation claims.) If the employer satisfies this burden, the plaintiff must show that the proffered reason for the adverse action is pretext. *Id.*

Here, Davis argues that she engaged in a protected activity when she filed internal complaints related to wage discrimination and sexual harassment. Those complaints were filed in April and May 2011, respectively. In addition, her EEOC complaint was filed in June or July of 2011. Davis, however, was moved to CESCO's warehouse in January 2011 and then reassigned to Project Specialist in February 2011. Sullivan appraised Davis's performance as Quotation Specialist in February and March of 2011. Thus, both Davis's reassignments and the poor performance appraisals antedate both her internal complaints and her EEOC complaint. Thus, even if the Court assumes that the first two prongs of the *prima facie* case are satisfied,[2] Davis cannot show causation. While courts have upheld "anticipatory retaliation" claims, *see Sauers v. Salt Lake County*, 1 F.3d 1122 (10th Cir. 1993) ("Action taken against an individual in anticipation of that person engaging in protected opposition to discrimination is no less retaliatory than action taken after the fact; consequently we hold that this form of preemptive retaliation falls within the scope of [Title VII]."); *U.S.E.E.O.C. v. Bojangles Restaurants, Inc.*, 284 F. Supp. 2d 320, 328 (M.D.N.C. 2003) ("An employer may not discriminate against an employee who it fears will later file a charge, testify, assist, or participate in an investigation or

---

[2] As to the first prong, Davis claims all three of her complaints–the two internal complaints and the EEOC complaint–were protected activity. As to the second, Davis claims that the reassignments to the CESCO warehouse and then Project Specialist were demotions constituting adverse employment action. In addition, Davis claims that Sullivan's poor annual appraisal of her in her position as Quotation Specialist was also adverse employment action. *See Joens v. John Morrell & Co.*, 243 F. Supp. 2d 920, 947 (N.D. Ia. 2003) (quoting *Gagnon v. Sprint Corp.*, 284 F.3d 839, 850 (8th Cir. 2002), *cert. denied*, 537 U.S. 1001, 123 S.Ct. 485, 154 L.Ed.2d 396 (2002), *abrogation recognized on other grounds, Maxfield v. Cintas Corp., No. 2*, 487 F.3d 1132 (8th Cir. 2007) (citation omitted)) ("'An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard ....'").

11

hearing."); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (interpretation of Title VII should not "provide a perverse incentive for employers to fire employees who might bring Title VII claims."), nothing in the record shows that Davis was reassigned or poorly appraised in anticipation of her filing internal complaints and an EEOC complaint. The record does support, and Davis has not controverted, CESCO's claim that Davis was reassigned based on her inabilities as a Quotations Specialist.

Even if the Court assumed that Davis satisfied the *prima facie* case, CESCO has put forth legitimate, nondiscriminatory bases for its actions. "Davis was moved to the warehouse for performance issues and because she could not answer questions and wanted to learn the product. Davis claims that she suffered an adverse employment action when she was unable to provide input into her appraisal; however her electronic signature appears on the review." Defendants' Brief in Support at 12 (citations omitted). Davis offers nothing in support of pretext, which is her burden to provide. Summary judgment is granted in favor of CESCO on Davis's claim of retaliation in violation of the Civil Rights Act (Count Three of the Second Amended Complaint).

The foregoing addresses only Davis's claim of retaliation under Count Three of the Second Amended Complaint. Davis's hostile work environment claim (Count Two of the Second Amended Complaint), however, also contains claims that the environment was made hostile in retaliation of Davis's filing her internal complaints with CESCO HR. Davis makes two retaliation claims in Count Two of her Second Amended Complaint

First, Davis argues that Mendel's above-described behavior was in retaliation to her filing an internal charge of wage discrimination. Finding that, for purposes of summary judgment, Mendel's actions rise to the level of actionable hostile work environment, a claim of retaliation based on the same facts is viable. The fact that some of Mendel's behavior occurred before and after Davis filed her complaint of wage discrimination does not change the conclusion that Mendel's actions may rise to the level of actionable retaliatory hostile work environment.

As to the *prima facie* case of retaliation, the first prong is satisfied: Davis engaged in protected activity by filing her charge of wage discrimination. The second prong is also satisfied: Davis's claim of hostile work environment supports a showing of adverse employment action. As to the third prong, the Court finds that the temporal connection between Davis's internal complaint and Mendel's behavior is sufficient to demonstrate causation. "In . . . retaliation claims, a temporal connection between an event and an adverse employment action can serve as

12

evidence supporting a *prima facie*[] showing of causation." *Myers v. Hog Slat, Inc.*, 55 F. Supp. 3d 1145, 1158 (N.D. Iowa 2014). "[T]iming *alone*[,however,] is not adequate to establish causation unless the timing is 'very close,' usually meaning less than one month." *Id.* (citing *Lors v. Dean*, 746 F.3d 857, 865-66 (8th Cir. 2014) (stating that claims of retaliation generally require more than mere temporal connection)) (emphasis in original). *See Hill v. Walker*, 918 F. Supp. 2d 819, 833 (E.D. Ark. 2013) (citing *Smith v. Allen Health Sys. Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) (two weeks "barely" sufficient for causation)) ("In detailing what amount of time, by itself, between a protected activity and an adverse employment action is sufficient to maintain a claim in the retaliation context, the Eighth Circuit concluded that two months cannot justify a finding of causation, where a 'matter of weeks' can."). *But see Sprenger v. Federal Loan Bank of Des Moines*, 253 F.3d 1106, 1114 (8th Cir. 2001) ("We have been hesitant to find pretext or discrimination on temporal proximity alone and look for proximity in conjunction with other evidence.").

Here, Davis filed her internal complaint in April 2011. Mendel's harassing behavior began in March 2011 and persisted into May 2011. While the exact dates of each of Davis's encounters with Mendel are unclear from the record, it is a plausible presumption that some came within the "matter of weeks" threshold. In addition to timing, however, the record also shows that Holt confronted Davis in July 2011. During this encounter, Holt told Davis that the CESCO employees were mad at Davis "for what [Davis] did." Second Amended Complaint, Doc. 130-1, at 12; Plaintiff's Response, Doc. 132-11, at 2. While Holt's comment came after the Mendel incidents, there is no showing that it was only in July that CESCO employees became aware of Davis's complaint. To the contrary, on June 1, 2011, Sullivan sent a "threatening" email to employees, including Davis, regarding "'anonymous'" complaints. Second Amended Complaint, Doc. 130-1, at 11; Chicoine Affidavit, Doc. 69-2, at 13. The timing of Mendel's encounters with Davis in conjunction with the statements made by Sullivan and Holt cause the Court to find that Davis has satisfied the *prima facie* case of retaliatory hostile work environment, Count Two of the Second Amended Complaint. The burden thus shifts to CESCO to offer nondiscriminatory bases for Davis's treatment.

For its part, the only offerings CESCO makes are that (1) Mendel's actions do not rise to the level of actionable hostile work environment and (2) Sullivan was not aware of any alleged harassment. Defendants' Brief in Support at 8. The Court rejected both of those arguments

above. Thus, CESCO has failed to provide nondiscriminatory bases. As such, Davis need not establish pretext and CESCO's motion for summary judgment is denied.

Second, in her Second Amended Complaint, Davis makes a claim of retaliation based on several events: (1) Male coworkers, including Sullivan, made lewd comments to both women working at CESCO and women "patronizing a gas station behind the [CESCO] bulding." Second Amended Complaint, Doc. 130-1, at 11. (2) Male coworkers would not provide necessary files and paperwork for Davis to perform her job as Project Specialist. *Id.* at 12. (3) On June 1, 2011, Sullivan sent a "threatening" email to employees, including Davis, regarding "'anonymous'" complaints. *Id.*; Chicoine Affidavit, Doc. 69-2, at 13. (4) In July 2011, Holt told Davis that the employees at CESCO were mad at Davis "for what [Davis] did." Second Amended Complaint, Doc. 130-1, at 12; Plaintiff's Response, Doc. 132-11, at 2. (5) On or about August 15, 2011, Holt made other disparaging remarks against Davis. Second Amended Complaint, Doc. 130-1, at 12.

Again, Davis's complaints were protected activity. While the five events above all appear to have occurred after Davis filed her complaints, no argument is made by either Davis or CESCO that these events may be recognized as "adverse employment action" within the meaning of Title VII. In fact, it does not appear that Defendants have addressed these events at all in their Motion for Summary Judgment. Summary judgment, therefore, is denied as genuine issues of material fact remain as to the five events unrelated to Mendel.

To clarify, both of Davis's retaliation claims under Count Two of the Second Amended Complaint survive summary judgment. Davis's claim of retaliation under Count Three, however, does not withstand summary judgment.

### Disparate Treatment Based on Gender (Clerical Designation)

"Title VII requires employers to treat employees who are members of protected classes the same as other similarly situated employees, but it does not create substantive rights to preferential treatment." *Lang v. Star Herald*, 107 F.3d 1308, 1312 (8th Cir. 1997), *reh'g en banc denied* (citing 42 U.S.C. § 2000e-2(j)). "In a disparate treatment claim, '[t]he employer . . . treats some people less favorably than others because of their . . . sex.'" *E.E.O.C. v. United Parcel Service, Inc.*, 141 F. Supp. 2d 1216, 1219 (D. Minn. 2001) (quoting *Int'l Bhd. Of Teamsters v. U.S.*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)) (alterations in original). In an intentional discrimination case, the liability of the employer "'depends on whether [a] protected trait . . . actually motivated the employer's decision.'" *Id.* (quoting *Krauel v. Iowa*

*Methodist Med. Ctr.*, 95 F.3d 674, 682 (8th Cir. 1996) (citation omitted)) (ellipsis in original). Proof of discriminatory motive is crucial, but "in some cases such motive can be inferred from the differences in treatment." *Id.* (citing *Krauel v. Iowa Methodist Medical Center*, 915 F. Supp. 102, 111 (S.D. Ia. 1995), *aff'd* 95 F.3d 674 (8th Cir. 1996)).

To withstand summary judgment on her claim of discrimination based on disparate treatment, Davis must satisfy *McDonnell Douglas*. Under the burden-shifting framework, Davis must satisfy the *prima facie* case: (1) that she belonged to a protected class, (2) that she was qualified to receive the benefit in issue, (3) that she was denied the benefit, and (4) the benefit was available to other employees with similar qualifications. *Star Herald*, 107 F.3d at 1311 (citing *Adams v. Nolan*, 962 F.2d 791, 794 (8th Cir. 1992)); *Joens v. John Morrell & Co*, 243 F. Supp. 2d 920, 947 (N.D. Ia. 2003) (citing *Simmons v. New Public School Dist. No. Eight*, 251 F.3d 1210, 1214 (8th Cir. 2001); *Schoffstall v. Henderson*, 223 F.3d 818, 825 (8th Cir. 2000)). Upon establishing the *prima facie* case, a burden of production is placed on CESCO to produce legitimate, nondiscriminatory bases for the treatment. If CESCO is successful, the burden returns to Davis to show that CESCO's proffered bases are pretext for discrimination.

Here, the first prong is satisfied since, as a woman, Davis is a member of a protected class. As for the second prong, Davis asserts that she was qualified for three benefits: One, Davis claims that, in her position as Quotations Specialist, she was entitled to the benefit of being categorized as "Sales" and not "Clerical." Second Amended Complaint, Doc. 130-1, at 15.Two, Davis asserts that she was entitled to the benefit of being allowed input during the employment appraisal process. *Id.* Three, Davis asserts that she was entitled to the Quotation Specialist position along with commission pay. Instead, she was demoted to a positon that provided support for her replacement in the Quotation Specialist position, Mendel–a male.

Davis's first claimed benefit is rejected. The only evidence showing a written "clerical designation" is the "Salary Change Notice" (the "Notice"). Chicoine Affidavit, Doc. 69-8. The Notice took effect on May 1, 2010 and notes Davis's pay increase as part of her new title as Quotations Specialist. The Notice does make reference to a clerical positon, but the reference is to Davis's "[p]reviously held positions." *Id.* In fact, in Davis's deposition, she stated that she "was hired as clerical[.]" *Id.*, Doc. 69-1, at 2. She does also state in her deposition, however, that as Project Specialist she was there to assist Mendel with the clerical portion of bids. *Id.*, Doc. 69-2, at 7. She was compelled to explain to her previous customers how she no longer was bidding

on jobs. *Id.* The record also demonstrates that the Project Specialist position was created for Davis and no one has held the position since her resignation. In any event, specific to the Quotations Specialist position, there is no showing that it was designated as clerical in nature and the only evidence pointed to by Davis, the Notice, does not support her claim.

As to the second, Davis offers nothing in support of being entitled to the claimed benefit. While she states that she was customarily allowed input, she has not shown that the custom was actually in place or that anyone else besides her was receiving the benefit of input. Moreover, as noted above, her electronic signature appears on the appraisals in issue. Thus, the Court also rejects the second claimed benefit.

The third, and final, benefit is accepted by the Court.[3] The record supports that employees in the Quotations Specialist positon received commissions. As two examples, both Herman and Mendel received commissions. The record also supports that Sullivan encouraged Davis to be a Quotations Specialist. Chicoine Affidavit, Doc. 69-3, at 7. Herman went so far as to indicate to Davis that she would be receiving commissions as part of the Quotations Specialist title. Thus, Davis's third claimed benefit satisfies the second prong of the *prima facie* case.

The third prong of the *prima facie* case has also been satisfied. Davis has demonstrated that she was denied the ability to make commissions during her time as a Quotations Specialist. Nothing in the record shows otherwise.

The fourth prong is also satisfied. After Davis was removed from the quotations position, she was replaced by Mendel. While CESCO claims that Davis was removed due to performance issues, the record shows that Mendel also received complaints about his performance. In Sullivan's appraisals of Mendel's performance, he noted that Mendel "loses focus easily."

---

[3]     The Court does note that Davis has cited Sullivan's deposition in a misleading manner. In Davis's response to paragraph 54 of Defendants' Statement of Material Facts, Doc. 132 at 29, she quotes Sullivan as saying that Davis was "'[v]ery reliable, always came to work on time. Did her job very well[.]'" Plaintiff's Response at 29 (quoting Chicoine Affidavit, Doc. 69-3, at 2) (first alteration in Plaintiff's Response). Paragraph 54 of Defendants' fact statement focuses on Davis as a Quotations Specialist. By contrast, the quoted language Davis cites to dispute paragraph 54 lacks the proper context. The quoted language was an answer by Sullivan to the question of how Davis was as an employee "the first few years she was at Crescent[.]" Chicoine Affidavit, Doc. 69-3, at 2. Thus, the quote has no relevance to her ability as a Quotations Specialist as her time in that position came after her first few years of employment.

Also in her dispute of paragraph 54, Davis quotes Sullivan as stating "that there were 'no particular issue[s] with Davis'[s] performance in the Quotations Specialist position.'" Plaintiff's Response at 29-30 (quoting Sullivan). Davis has misquoted and, again, failed to provide context. Sullivan actually stated that "there were issues that occur with any new person in that position," Chicoine Affidavit, Doc. 69-3, at 8, but that he could not "recall any [] *particular* issues." *Id.* (emphasis added). Thus, Sullivan actually stated during his deposition that problems with Davis's performance did exist, but that he, at that time, could not recall specifics.

Plaintiff's Response, Doc. 132-1, at 2. In addition, Sullivan noted in the appraisals that Mendel "[w]anders around more than [Sullivan] like[s][]" and that "clear goals for improvement" need to be set. *Id.*, Doc. 132-2, at 2. *See id.*, Doc. 132-3, at 2. Ultimately, a general comparison of Mendel's (Plaintiff's Response, Docs. 132-1, 132-2, 132-3) and Davis's (Chicoine Affidavit, Doc. 69-17) performance appraisals reveal many similarities. As such, the Court finds that Davis has satisfied the fourth prong. The burden shifts to CESCO to produce nondiscriminatory reasons for Davis's treatment.

CESCO maintains that Davis was removed from the quotations position due to her performance. Moreover, in spite of Davis's various reassignments, her hourly pay rate remained unaffected after she was removed from the Quotations Specialist position. CESCO argues that Davis struggled with the company's products and, as a result, had to be removed from the quotation position. In addition, she was not granted commissions because she, instead, received an hourly rate pay increase. Mendel, on the other hand, received commissions as a Quotations Specialist because he carried that benefit over form his previous position in counter sales. Having produced legitimate bases, the burden returns to Davis to demonstrate pretext.

Pretext has been shown in various ways. First, Herman, who Davis claims she was to be working for, *see* Plaintiff's Response, Doc. 132, at 8 ¶ 16, stated to Davis that she would be receiving commissions. While Sullivan subsequently informed Davis that she would not be receiving commission pay and that Herman should not have informed her otherwise, it still remains that Herman, a Quotations Specialist himself, believed that Davis would receive commission pay in the quotations position. At the very least, Herman had input into whether to place Davis as a Quotations Specialist. Chicoine Affidavit, Doc. 16-14, at 2 (in CESCO's answer to Davis's interrogatory, CESCO states that both Sullivan and Herman had input into Davis's recruitment into quotations).[4] In addition, in the deposition of William John Beaird ("Beaird"), a CESCO employee, he stated that, on at least one occasion, he received a commission on one of Davis's accounts during her time as Quotations Specialist. Plaintiff's Response, Doc. 132-4, at 2 (when asked "if [he] ever received a commission from a bid that [Davis] did that she didn't receive commission for[,]" Beaird responded, "the Phase Electric one, I know I got commission

---

[4] In her response to Defendants' fact statement, Davis asserts that this interrogatory answer "is an admission that both Jim Sullivan and Ken Herman agreed to pay Davis commissions when they recruited her." Plaintiff's Response at 16 ¶ 31. The Court is not persuaded. Neither the interrogatory question nor answer pays any mention to commissions.

on that."). The Court finds that Davis has established pretext. As a result, summary judgment is denied on the count of Disparate Treatment Based on Gender (Clerical Designation).

## Disparate Treatment Based on Gender (Training)

Davis also claims that she was treated disparately insofar as a male coworker, Mendel, received training that she did not. Applying the law above, Davis, again, satisfies the first prong of the *prima facie* case of disparate treatment. The second prong is satisfied. According to CESCO, Mendel and other Quotations Specialists had previous sales experience. *See* Defendants' Brief in support at 15 ("[o]ther Quotations Specialists had experience in the warehouse[.]"). In fact, Mendel's experience in sales is why he received commission pay in the quotations position. Davis, however, had no experience in sales, but was still told that she did not need product training. The third prong is satisfied. Davis was told that she did not need product training to be a Quotations Specialist. As a result, no training was offered to her and she did not pursue any. Finally, Davis has satisfied the fourth prong. As stated, Mendel had previous sales experience that provided him with the ability to perform in the Quotations Specialist position. Davis had no such experience yet she was told that training was not necessary. The Court finds that Davis has satisfied the *prima facie* case. The burden shifts to CESCO to put forth nondiscriminatory reasons for Davis's treatment.

According to CESCO, product training is not needed in order to be successful in the Quotations Specialist position. In addition, training for the position itself, unrelated to the products, is undertaken on the job by the outgoing Quotations Specialist. After discovering that Davis was finding it difficult in the Quotations Specialist position, Sullivan placed her in the warehouse in order to familiarize her with CESCO's inventory. Because of the volume of inventory, CESCO claims that Davis continued to struggle. She was, therefore, provided an opportunity to train in the warehouse and was not denied training based on her gender. Having put forth nondiscriminatory bases, the burden returns to Davis to show pretext.

To show pretext, Davis argues that, while she was placed in the warehouse in order to understand the inventory and successfully return to the quotations position, she never was returned. Instead, a new position, Project Specialist, was created for her. She was placed in that position in February 2011. In addition, after being placed in the Project Specialist position, Davis was scheduled for two trainings–EDGE and EPEC–to take place sometime in March 2011 or after. *See* Chicoine Affidavit, Doc. 69-17, at 7, 13 (Sullivan notes in Davis's performance

18

appraisal, signed and dated by Sullivan on March 23, 2011, that she had been scheduled for the trainings). These trainings, however, were scheduled for Davis after she had been placed in the Project Specialist position.[5] Thus, rather than simply place Davis in the trainings, CESCO placed her first in a new position and then scheduled her for training that might have helped her in her position as Quotations Specialist. The Court finds that Davis has satisfied the showing of pretext. CESCO's motion for summary judgment is denied on the Disparate Treatment Based on Gender (Training) count.

## Constructive Discharge

"Constructive discharge occurs when an employer 'deliberately renders the employee's working conditions intolerable and thus forces the employee to quit h[er] job.'" *Allen v. Bridgestone/Firestone, Inc.(Firestone)*, 81 F.3d 793, 796 (8th Cir. 1996) (quoting *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir. 1993)). The employer must act with the intent to force the employee to resign. *Id.* To that end, a plaintiff can satisfy the intent requirement by demonstrating that her resignation was a foreseeable result of the employer's actions. *Id.* "Additionally, to prove a constructive discharge occurred, the plaintiff must demonstrate that a reasonable person would find the working conditions intolerable." *Bunny Bread*, 646 F.2d at 1256. Intolerability is not judged against the plaintiff's subjective feelings, but by an objective standard. *Firestone*, 81 F.3d at 796 (citing *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 497 (8th Cir. 1995)). Working conditions can be rendered intolerable through employer inaction just as well as action. *Sanders v. Lee County School Dist. No. 1*, 669 F.3d 888, 893 (8th Cir. 2012). Finally, the employee must show that she gave her employer a reasonable opportunity to remedy a problem before the employee quit. *Id.*

Davis bases her claim of constructive discharge on "wage discrimination based on gender, adverse employment action and retaliation, which was reasonably foreseeable." Second Amended Complaint, Doc. 130-1, at 18. Based on the above, since her claim of wage discrimination fails, a claim of constructive discharge based on wage discrimination likewise

---

[5] Davis argues in her response to Defendants' fact statement that the trainings "did not take place until after Davis complained of Wage Discrimination[.]" Plaintiff's Response at 31. Such an assertion, however, is not supported by the record. Davis alleges in her Second Amended Complaint that she filed her internal complaint about wage discrimination on April 25, 2011. Nothing in the record suggests that the complaint was filed in the previous months. Thus, while the record does not show if Davis eventually undertook the trainings after she filed her internal complaint of wage discrimination, the record does show that they were scheduled prior to the complaint. *See* Chicoine Affidavit, Doc. 69-17, at 7, 13 (the performance appraisal wherein Sullivan notes that Davis had been scheduled for the trainings was signed and dated by Sullivan on March 23, 2011).

fails. Adverse employment action (i.e., disparate treatment) and retaliation, however, are viable bases for constructive discharge.

The Eighth Circuit has explained that offering an employee a new position after the employer has already removed the employee from a previous position does not defeat the plaintiff-employee's claim of constructive discharge. That is so "'because [m]erely offering a different job to an employee does not necessarily shield an employer from liability for constructive discharge[.]'" *Lee County School Dist.*, 669 F.3d at 893 (quoting *Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 574 (8th Cir. 1997)) (alterations in original). Thus, even if the Court accepted that "Davis did not perceive threats from co-workers until after she left CESCO[,]" Defendants' Brief in Support at 18, that is not sufficient to defeat a claim of constructive discharge since perceived threats are not the only viable basis for such a claim.

CESCO also argues that Davis left CESCO of her own free will because she was seeking other employment during her time at CESCO. *Id.* That Davis was seeking other employment while working at CESCO is not dispositive as her doing so could be found by a jury to have been in response to the environment at CESCO. To support the argument that that Davis left CESCO of her own free will is significant, CESCO cites *Jeffries v. State of Kansas*, 147 F.3d 1220, 1233 (10th Cir. 1998), for the proposition that an employee who quits her job of her own free will cannot hold her employer liable for constructive discharge. The Court rejects such a proposition. To find that an employee who quits her job of her own free will cannot therefore pursue a constructive discharge cause of action would undermine constructive discharge doctrine. The discharge is called constructive because the employee quits, she is not terminated. *See Wensel v. State Farm Mut. Auto. Ins. Co.*, 218 F. Supp. 2d 1047, 1063 (N.D. Ia. 2002) (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998)) ("'The term 'constructive discharge' refers to the situation in which an employee is not fired but quits, but in circumstances in which the working conditions have made remaining with this employer simply intolerable.'").

Because summary judgment is denied on Davis's retaliation claims in Count Two and her claims of disparate treatment, summary judgment is also be denied on Davis claim of constructive discharge. That Davis was denied certain trainings until after her demotion and was, in addition, denied commission that she may have been entitled too precludes summary judgment in favor of CESCO. Whether the environment was sufficiently objectively intolerable is a question for a jury.

20

## CONCLUSION

The Court holds that Davis has failed to withstand summary judgment on her claims of wage discrimination and, in part, her claim of retaliation, Count Three. As to wage discrimination, Davis has not controverted that she was in fact paid more than Mendel. Such a failure defeats a charge of wage discrimination. To the extent that her claim of retaliation rests on her reassignments and performance appraisals, the retaliation claim, Count Three, too, is found to be ripe for summary judgment in favor of Defendants.

The two claims of disparate treatment, the hostile work environment claim, the retaliation claims in Count Two, and the constructive discharge claim have withstood summary judgment. Genuine issues of material fact remain in each. As to the hostile work environment, a jury will be tasked with deciding if Mendel's behaviors rose to the level of hostile work environment based on sexual harassment. The jury must also decide if the actions of Mendel and other CESCO employees were retaliation in response to Davis's internal charges of wage discrimination. On the disparate treatment counts, it is for a jury to decide whether CESCO's treatment of Davis was discriminatory or not. Likewise, it is for the jury to decide if CESCO's treatment of Davis rises to the level of constructive discharge. Finally, count seven (Breach of Oral Contract) of Davis's Second Amended Complaint, Doc. 130-1, at 19, remains as that count was not the subject of Defendants' motion for summary judgment. Accordingly,

IT IS ORDERED that:

(1) Plaintiff Lisa A Davis's Motion for Leave to File Second Amended Complaint, Doc. 130, is granted, and Plaintiff shall file and serve the Second Amended Complaint, as proposed.

(2) Defendants' Motion for Summary Judgment on Plaintiff Lisa A. Davis's claim of Wage Discrimination based on Gender (Count One of the Second Amended Complaint) is granted.

(3) Defendants' Motion for Summary Judgment on Plaintiff Lisa A. Davis's claim of Hostile Work Environment (Count Two of the Second Amended Complaint) is denied.

(4) Defendants' Motion for Summary Judgment on Plaintiff Lisa A. Davis's claim of Retaliation (Count Two of the Second Amended Complaint) is denied.

(5) Defendants' Motion for Summary Judgment on Plaintiff Lisa A. Davis's claim of Retaliation Under the Civil Rights Act (Count Three of the Second Amended Complaint) is granted.

(6) Defendants' Motion for Summary Judgment on Plaintiff Lisa A. Davis's claim of Disparate Treatment Based on Gender (Clerical Designation) (Count Four of the Second Amended Complaint) is denied.

(7) Defendants' Motion for Summary Judgment on Plaintiff Lisa A. Davis's claim of Disparate Treatment Based on Gender (Training) (Count Five of the Second Amended Complaint) is denied.

(8) Defendants' Motion for Summary Judgment on Plaintiff Lisa A. Davis's claim of Constructive Discharge (Count Six of the Second Amended Complaint) is denied.

(9) Plaintiff Lisa A. Davis's claim of Breach of Oral Contract (Count Seven of the Second Amended Complaint) remains.

(10) Defendants' Motion to Deem Facts Admitted, Doc. 77, is now moot

(11) Defendants' Motion to Dismiss for Failure to Comply with a Court Order or to Grant Summary Judgment, Doc. 111, is now moot.

(12) Plaintiff Lisa A Davis's Motion for Expedited Consideration of Plaintiff's Motions for Sanctions, Doc. 115, was mooted by this Court's memorandum opinion dated April 21, 2016, Doc. 121.

22

Dated this $\underline{5}$ day of August, 2016.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: _____
(SEAL)        DEPUTY

23